IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF
THE RESIDENCE LOCATED AT 1599
EAGLE STREET, UNIT B, ANCHORAGE,
ALASKA.

Case No. 3:22-mj-00229-MMS


May 042022

## AFFIDAVIT IN SUPPORT OF AN

## APPLICATION UNDER RULE 41 FOR A

## WARRANT TO SEARCH AND SEIZE

I, R. Allen Adair, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND DETECTIVE BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal
    Procedure for a search warrant authorizing the search of **1599 Eagle Street, Unit B,
    Anchorage, Alaska** and the seizure of evidence, instrumentalities, and fruits of violations of
    Title 18 U.S.C. §924(c)(1)(A), Possession of a Firearm in Furtherance of Drug Trafficking;
    Title 18 U.S.C. §922(j), Possession of Stolen Firearms; Title 18 U.S.C. §922(g)(3), Possession
    of a Firearm by a Drug User.

2.  I am a Police Officer employed by the Municipality of Anchorage Police Department and am
    presently a Commissioned Police Officer in the State of Alaska. Between May 2007 and April
    2019, I was assigned to the Anchorage Police Department's (APD) Vice Unit. My assignment
    with the Vice Unit focused on investigations related to prostitution, human trafficking and
    trafficking of controlled substances.

3.  I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal
    Rules of Criminal Procedure. In April 2019, I was assigned to a task force position with the
    Bureau of Alcohol, Tobacco, Firearms, and Explosives. My duties continue to focus on
    controlled substance and firearm related crimes impacting the Anchorage Community.


4. I have more than twenty-five years of combined law enforcement experience. I was an explosive and drug detector dog handler with the United States Air Force from June 1991 to August 1996. In August 1996, I was credentialed as a Special Agent with the Air Force Office of Special Investigations. In August 2004, I left active duty with the military and was employed with the Anchorage Police Department as an Officer. I retired from the Air Force Office of Special Investigations in May 2011.

5. I have graduated from three basic law enforcement academies. The first was the United States Air Force Police Academy in December 1991. The second was the Air Force Office of Special Investigations Academy in November 1996 and the third was the APD Academy in January of 2005.

6. During my tenure as a drug detector dog handler, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, and trafficking of controlled substances. This training also included the investigation of crimes involving the use, possession, and trafficking of controlled substances throughout the continental United States and military bases abroad.

7. I attended and graduated from a six-month special investigations academy operated by the Department of Defense. While attending this academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. This training predominately focused on the investigation of crimes involving the use, possession, manufacture and trafficking of controlled substances and the means by which to infiltrate and/or identify individuals and organizations involved in the use, possession, manufacture and trafficking of controlled substances.

8. I attended and graduated from a five-month police academy operated by APD. While attending APD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. In an extension of APD's academy, and subsequent to graduation from


APD's academy, I received training and instruction from several APD field training officers. This training included investigation of crimes involving the use, possession, manufacture, and trafficking of controlled substances in the Anchorage area.

9. The majority of my police experience has been as a Special Agent assigned to various Joint Drug Enforcement Teams in Texas, California, and Alaska, followed by my tenure with APD's Vice Unit. My duties include watching for illegal activities, interviewing witnesses, victims and suspects, developing probable cause for cases, examining crime scenes in order to develop evidence to substantiate or disprove the allegation being investigated, handling and processing various types of evidence, utilizing human sources of information to resolve drug and other criminal related investigations, and assembling cases for possible prosecution by Federal, State, Municipal and Military Judicial Offices. In my law enforcement career, I have conducted hundreds of drug related investigations, involving the use, possession, manufacture, and trafficking of marijuana, lysergic acid diethylamide (LSD) cocaine hydrochloride, cocaine base (crack), heroin, ecstasy (MDMA), psilocybin mushrooms, methamphetamine, controlled prescription medication While conducting these investigations, I have interviewed several hundred people, involved either directly or indirectly with the crimes being investigated. I have also served or assisted in serving several drug related search warrants resulting in the seizure of the above mentioned drugs as well as firearms, ammunition, packaging materials, assorted concealment containers, cutting agents, digital and beam scales, cellular telephones, surveillance systems, marijuana grow operations, methamphetamine laboratories, cameras, body armor, memory cards, computers and related equipment, various electronic equipment purchased with illicit proceeds, documents, money, precious metals, gems, stolen property, address books, and assorted paraphernalia utilized to ingest controlled substances.

10. Based on my training and experience, I know people involved in the use, possession, manufacture, and/or drug trafficking of controlled substances commonly possess and use cellular telephones, standard telephones, and computers to facilitate these activities. Regarding cellular telephones in particular, I know drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks


attendant with operating from a fixed location. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources.

11. It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

12. It is common for members of drug trafficking organizations to maintain telephonic/text message/messenger communications before, during and after drug transactions. Calls and/or text messages are often made between the drug source of supply and the drug recipient, prior to departure of a drug courier and upon arrival of a drug courier at the destination. Once at the destination, it is common for the courier to contact the recipient, via the telephone. Records of such contacts, whether call logs or text messages, are frequently maintained in the cellular telephone's memory.

13. It is common for individuals involved in drug trafficking to use multiple cellular telephones to maintain contact with their associates. These individuals use multiple cellular telephones because cellular telephones are mobile and can be easily obtained with a different subscriber name. Members of a drug trafficking organizations, to thwart law enforcement detection of their illicit drug trafficking activities, often use a different subscriber name and/or telephone number. These different telephone numbers often have different subscriber names and/or are pre-paid cellular telephones where the subscriber is difficult to determine. Because several different telephone numbers may be used, it is common for traffickers of controlled substances to maintain the names and telephone numbers of associates within the cellular telephone memory. These associate names and telephone numbers may be stored in historical call logs, text-messaging history or within the contacts section of the cellular telephone.


14. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). The aforementioned images are frequently maintained in the memory of cellular telephone devices. Devices such as smart cellular telephones often imprint each photo with the GPS coordinates where such photos are taken. Thus, it is possible to discern the location of stash houses and other evidence by analyzing a digital photo.

15. Certain cellular telephones have a feature which allow the subscriber or user of the device remote access to "wipe" or delete all the information if the device no longer in their possession whether it be because it is lost, stolen, or seized.

16. It is common for members of drug trafficking organizations to receive non-traditional forms of payment for their illicit substances. Examples are stolen retail goods, stolen firearms, electronic fund transfer applications, and State of Alaska food subsistence cards.

17. With respect to firearms, it is common for drug suppliers and/or purchasers to possess firearms due to the inherent risk associated with the drug subculture. These risks include robbing one another of illicit drugs and/or the currency or other items of value derived from selling these illicit substances. The mere presence of or implication of a firearm by one or more of the individuals engaged in a drug transaction is often enough to dissuade a robbery attempt.

18. I received an associate in applied science, criminal justice degree from the Community College of the Air Force in 2004. I have attended the following courses to supplement training I received while attending the previously mentioned law enforcement academies:

    (i)        Department of Justice Operation Jetway Course, July 2018
    (ii)      DEA Social Media for Investigation Course, April 2018
    (iii)     FLETC Single Officer Response to an Active Threat, June 2018
    (iv)     DEA Social Media for Investigation Course, July 2014
    (v)      DEA Narcotic Management and Leadership Course, October 2012
    (vi)     DEA Prescription Drug Diversion Investigations Course, August 2012
    (vii)    DEA Drug Interdiction Course, September 2011


| | |
|---|---|
| (viii) | Investigating Drug Trafficking Organizations Course, August 2011 |
| (ix) | DEA Basic Drug Investigations Course, August 2010 |
| (x) | Mid-Level Narcotic Investigation Course, June 2010 |
| (xi) | DEA Indoor Marijuana Cultivation Investigations Course, July 2008 |
| (xii) | International Money Laundering Investigations, July 2008 |
| (xiii) | National Center for Missing and Exploited Children, Protecting Victims of Child Prostitution, January 2008 |
| (xiv) | DEA Controlled Substance Concealment Course, January 2008 |
| (xv) | Anchorage Police Department Crime Scene Processing Course, November 2004 |
| (xvi) | Anchorage Police Department Patrol Officer Academy, August 2004 |
| (xvii) | DoD Polygraph Institute Credibility Assessment through Linguistic Analysis, April 2002 |
| (xviii) | Heinz Laboratories National Clandestine Drug Labs Course, January 2001 |
| (xix) | AFOSI Protective Service Operation Course, August 2000 |
| (xx) | USMC Urban/Rural Sniper/Counter-Sniper Training, January 2000 |
| (xxi) | AFOSI Counterintelligence and Force Protection Operations Course, November 1999 |
| (xxii) | AFOSI Evidence Custodian Training Course, May 1999 |
| (xxiii) | Practical Homicide Investigation Course, February 1999 |
| (xxiv) | Advanced Reid Technique of Interviewing and Interrogation, July 1998 |
| (xxv) | AFOSI Advanced Special Investigators Course, July 1998 |
| (xxvi) | AFOSI Forensics Course, October 1997 |
| (xxvii) | AFOSI Special Investigators Course, December 1996 |
| (xxviii) | Reid Technique of Interviewing and Interrogation, October 1996 |
| (xxix) | Investigative Skills for Street Gangs, March 1996 |
| (xxx) | Texas A & M Investigative Skills Course, November 1995 |
| (xxxi) | USAF Explosive and Drug Detector Dog Handler Course, March 1992 |
| (xxxii) | USAF Patrol Dog Handler Course, October 1991 |
| (xxxiii) | USAF Law Enforcement Specialist Course, September 1991 |

## **LOCATION OF RESIDENCE ASSOCIATED WITH THIS REQUEST**

19.     The residence referenced in this Affidavit is a ranch style home located at the northeast corner of East 16th Avenue and Eagle Street.  The 7,000 square foot lot is comprised of two separate residential structures.  The specific and only structure referenced in this affidavit is the ranch style home identified as Unit B.  **1599 Eagle Street, Unit B** is detached from Unit A and is situated on the eastern most portion of the lot.  The numerals "1599" are located on the west side of Unit A and there is a mailbox on the south side of Unit B with the alphanumeric "1599 B".  Additional descriptors and photographs are located in **Attachment A**.


May 042022

## LIMITED NATURE OF AFFIDAVIT

20.     I have participated in the investigation of the offenses set forth above.  The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from local law enforcement officers and information obtained from the analysis of reports.  All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.  I have not set forth each and every fact learned during the course of this investigation.  I have set forth only those facts which establish the foundation for probable cause.

## PROBABLE CAUSE

21.     At approximately 7:30 a.m., February 13th, 2022, Anchorage Police Department (APD) Officer Colby Wallace stopped a blue 2009 Scion, Alaska License: LBU650, for driving without lights and display of the incorrect license plate.  The contact with the vehicle operator, Merideth Kristen TURNER, resulted in her detention and the Scion being seized pending application of a search warrant.  During the initial Officer contact with TURNER, she consented to a search of her vehicle and her passenger, Coby Allen MARQUEZ, was arrested for outstanding warrants.  The officer located a padlocked backpack containing bulk, rubber banded currency, and a large, zippered bag of suspected heroin.  In addition to these items, TURNER told Officers she initially forgot to disclose a pistol in her purse within the vehicle.  The consent search was terminated, and the vehicle was impounded.  TURNER was carrying a black Samsung cellular telephone during her contact with Officers.  This phone was ultimately seized pending application of a search warrant.

22.     I met Officers at APD Headquarters to interview TURNER and MARQUEZ.  During my interview with MARQUEZ, he claimed TURNER was engaged in street level drug sales.  MARQUEZ knew TURNER was armed with a pistol earlier in the evening when she met him at the Econo Inn and asked for him to accompany her on a few errands.  When they met, TURNER was carrying several bags, to include a padlocked North Face backpack.  MARQUEZ stated



TURNER was distributing controlled substances in Anchorage with their mutual associate, Jose Antonio GALVAN Jr (aka: KC). *Note: This information was corroborated when GALVAN was contacted and arrested earlier in the morning with distributable amounts of suspected heroin and he too, was in possession of firearms.* TURNER elected to invoke her 5th Amendment Rights.

23. Officer Wallace petitioned for and received a warrant authorizing a search of TURNER's Scion in relation to a firearm and controlled substance investigation. The warrant was issued and assigned number: 3AN-22-00657SW. I assisted with the execution of the warrant. While we were executing the search warrant, I noticed TURNER's phone rang several times and received message traffic. The main screen of the phone bore TURNER's email address, "akmerideth1977@gmail.com" and a screen background photograph, "Queens don't compete with hoes." Based on the email address and Officer observations, I was confident this was in fact TURNER's telephone. I placed the cellular telephone in airplane mode in an attempt to preserve the data within.

24. A stolen 10mm Glock pistol with extended magazine and a shoulder holster was located under the driver seat where TURNER had been seated in the Scion. The extended magazine was removed from the firearm; however, the pistol was situated in a manner consistent with the driver having placed the firearm under the seat. The padlocked North Face backpack, described by MARQUEZ and claimed by TURNER, contained a digital scale, several new small, zippered bags associated with street level distribution, rubber banded currency totaling $1,920, approximately 5-7 grams of suspected methamphetamine, and approximately one ounce of suspected heroin. Each of these substances were field tested by me and indicated the presumptive presence of their suspected substances. TURNER's red purse/bag where her Glock Model 42 pistol was located, contained assorted drug paraphernalia, a drug ledger and $1,041 in currency.

25. On February 15th, 2022, I petitioned for and received a warrant (3AN-22-00678SW) for TURNER's cellular telephone, from the Superior Court for the State of Alaska. The warrant was granted and authorized message data, call logs, address book/contact list, and the number associated with the phone. Photographs and/or video recordings depicting the use, possession, or


Ma042022

distribution of illicit controlled substances / or firearms possessed in furtherance of drug crimes were not authorized based on the search warrant. The only message data authorized to be searched was from January 15th, 2022, to February 15th, 2022.

26.  The warrant was executed by APD Computer Crime Technician, M. Swanson and the limited data authorized by the warrant was provided to ATF Resident Agent in Charge (RAC) Aaron Ybarra for review. The telephone number associated with the cellular telephone was (907) 230-7810. A review of APD's TIBURON system indicated this number was provided by TURNER during Police contact in October 2021 and a version of this number (*220-7810*) was provided by TURNER during Police contact in December 2020. The data reviewed in the telephone clearly indicates the phone is associated with TURNER and she is engaged in significant drug sales within the community. In the messages searched there were discussions regarding firearm possession and potential firearm sales. The discussion of firearm possession was during the timeframe messages were also sent and received regarding drug transactions in violation of Federal firearm and drug laws.

27.  Based on the initial information obtained from State of Alaska search warrant, I petitioned United States Magistrate Judge Scoble for a warrant authorizing a complete review of the phone's data and the seizure of evidentiary data supporting violations of Federal laws. The warrant was issued by Judge Scoble on February 25th, 2022 and assigned number: *3:22-MJ-00113-MMS*. I immediately provided a copy of the warrant to Swanson for a complete data extraction. The extracted data was eventually provided to RAC Ybarra. RAC Ybarra stated the data extraction was limited and it appeared the third-party applications would require manual review.

28.  On March 22nd, 2022, I withdrew TURNER's cellular telephone from APD's Property / Evidence Section. Between March 22nd and March 24th, RAC Ybarra conducted a review of the phone's data for comparison to the data extraction completed by Swanson. I resumed custody of the phone on the 24th and began a physical analysis of the content on March 30th. My review disclosed TURNER was blatantly engaged in multi-ounce to pound quantity sales of methamphetamine and smaller sales of heroin. The majority of the phone data and messages



spanned from January 3rd, 2022, through TURNER's contact and arrest on February 13th, 2022. Her primary base of "operations" for drug sales as described by her, was the Black Angus Inn, located at 1430 Gambell Street and the Econo Inn, located at 642 E. 5th Avenue.

29.     While reviewing TURNER's photographs and the extracted data, I observed a digital scale indicating the weight of the substance upon the scale was 331.80 grams. Although the substance being weighed was not visible, the bottom of the scale contained small pieces of a light-colored substance consistent with methamphetamine. This photograph was taken on October 27th, 2021. The following day, October 28th, 2021, TURNER photographed a pistol grip shotgun, with a folding stock and drum magazine.

30.     On November 17th, 2021, TURNER's phone captured a Ruger .44 caliber revolver, serial number: 178-45085. The phone's geographical location (61.20634460449219, -149.87464904785156) was active when the picture of the revolver was taken. A query of these specific coordinates indicates the photograph of the revolver was taken at **1599 Eagle Street, Unit B, Anchorage, Alaska**, TURNER's primary physical residence. A query of the revolver's serial number with APD indicated it was stolen on June 9th, 2020 during the burglary of Gun Runners, located at 601 E. Northern Lights Boulevard, Anchorage, Alaska. As of April 18th, 2022, the revolver has not been recovered by Law Enforcement. A review of the stolen Ruger .44 caliber revolver, serial number: 178-45085 by Special Agent (SA) Ryan Borgeson disclosed the firearm was not manufactured in the State of Alaska, therefore it affected interstate commerce.

31.     In early January 2022, TURNER also scolds an accomplice who messages her, "Can I get two pounds". TURNER replies, "I don't have anything. And we need to work on our lingo and be more sly with our wording. I really don't want to spend the rest of my life in the federal penitentiary." During this same timeframe, TURNER photographed a large pile of rubber banded currency comprised predominately of $10, $20, and $100 bills. Approximately one week after the photograph of the money was taken, TURNER flew with the money to New Orleans to meet with her methamphetamine supplier in order to purchase additional quantities of drugs. After spending approximately six days in New Orleans, TURNER returned to Anchorage. This information was



based on TURNER's message traffic, photographs, flight reservations, and other data contained within her telephone during the forensic and manual review.

32.    In early February 2022, TURNER speaks with various associates about another of her associates plans to rob her.  This conversation is after another one of her other associates also claimed to have been robbed.  It is common in the drug culture to rob one another of money and/or controlled substances.  TURNER acknowledged the inherent risk associated with her drug dealing profession in different text messages.  TURNER boasts in a text message about having "several guns plus a taser that shoots 15 feet" for her protection when MARQUEZ offers her his firearm on February 9th,2022.   These conversations would occur mere days before TURNER and MARQUEZ's arrest on February 13th, 2022.

33.    On February 15th, 2022, TURNER was placed on pre-trial release with electronic monitoring.   She was remanded back into custody on March 30th for testing positive for methamphetamine and released two days later.  TURNER identified her physical address as **1599 Eagle Street, Unit B**, Anchorage, Alaska during her contact with Anchorage Pre-Trial Officers. Electronic and periodic physical surveillance of TURNER over the course of her initial arrest in February confirmed she routinely spends most of her time at **1599 Eagle Street, Unit B**, the Black Angus Inn, the Econo Inn, and a residential location in Anchorage known to be associated with her methamphetamine supplier.

34.    Firearms, specifically stolen firearms are commonly bartered for illicit controlled substances.  The photograph in November 2021, of the stolen revolver mentioned in paragraph 28, coupled with the stolen pistol located under her driver seat in February 2022, and the communications on her cellular telephone clearly indicate TURNER is engaged in large volume sales of illicit controlled substances and she utilizes firearms to protect her illicit endeavors.  Unlike controlled substances, firearms are commonly retained by drug traffickers substantially longer due to the protection they afford the trafficker.  In addition to the protection afforded, it is not uncommon for a trafficker to collect and retain assorted firearms based on their caliber, appearance, performance, concealability, or overt persuasive appearance.



35.     In my experience investigating violations of federal and state firearms laws, and from what other ATF agents have told me, firearms are not fluid commodities.  I have also participated in or have knowledge of the execution of numerous search warrants for firearms violations.  Firearms are commodities that are often retained and held for years.[1]

## CONCLUSION

36.     Based upon my training and experience, I know that pursuant to **Title 18 U.S.C. §924(c)(1)(A)** it is unlawful for any person during and in relation to a drug trafficking crime to use or carry a firearm in furtherance of any such crime.  **Title 18 U.S.C. §922(j)** indicates it shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm was stolen.  **Title 18 U.S.C. §922(g)(3)** states, it shall be unlawful for any person who is an unlawful user of or addicted to any controlled substance to possess in or affecting commerce, any firearm or ammunition.

37.  Based upon the aforementioned information, I believe that probable cause exists that TURNER's residence, located at **1599 Eagle Street, Unit B, Anchorage, Alaska**, contains evidence, instrumentalities, and fruits of violations of Title 18 U.S.C. §924(c)(1)(A), Possession of a Firearm in Furtherance of Drug Trafficking; Title 18 U.S.C. §922(j), Possession of Stolen Firearms; Title 18 U.S.C. §922(g)(3), Possession of a Firearm by a Drug User.

---

[1] Because firearms are often held for many years, the probable cause for a search for firearms may remain fresh for an extended period of time:  *United States v. Rahn*, 511 F.2d 290 (10th Cir.), cert. denied, 96 S.Ct. 41 (1975); *United States v. Batchelder*, 824 F.2d 563, 547 (7th Cir 1983); *United States v. Ellison*, 793 F.2d 942, 947 (8th Cir.), cert. denied, 107 S.Ct. 415 (1986); *United States v Maxim*, 55 F.3d 394, 397-398 (8th Cir.), cert. denied, 116 S.Ct. 265 (1995); *United States v. Collins*, 61 F.3d 1379 (9th Cir.), cert. denied, 116 S.Ct. 543 (1995).


38.  Based on the foregoing, your affiant is requesting that a search warrant be granted for **1599 Eagle Street, Unit B, Anchorage, Alaska**, referenced in this affidavit (**Attachment A**) and there is probable cause to believe **Merideth Kristen TURNER** is in violation of Title 18 U.S.C. §924(c)(1)(A), Possession of a Firearm in Furtherance of Drug Trafficking; Title 18 U.S.C. §922(j), Possession of Stolen Firearms; Title 18 U.S.C. §922(g)(3), Possession of a Firearm by a Drug User.

39.  Specifically, I request authorization to search for, and seize, the items listed in **Attachment B**.

40.  This search warrant affidavit and application were reviewed by Assistant United States Attorney Kelly Cavanaugh.

Respectfully submitted in person,

R. Allen Adair
Detective, Bureau of Alcohol, Tobacco, Firearms
and Explosives / Anchorage Police Department
Task Force

Subscribed and sworn to before me
in person on May 4, 2022.

Matthew M. Scoble, United States Magistrate Judge